IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A CELLULAR DEVICE WITH UNIQUE NUMBER OR IDENTIFIER: WHITE IPHONE WITH A CLEAR CASE CURRENTLY IN TBI TEMPORARY STORAGE CUSTODY | Case No. 1:23-mj- 0224-SKL |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Justin Headden, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property – electronic devices, namely, cellular telephones currently in law enforcement possession – and the extraction from that property of electronically stored information described in Attachment B.

2. I am a Task Force Officer with the Drug Enforcement Administration (DEA) Field Office in Chattanooga, Tennessee. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

3. I am a Police Officer with the Chattanooga Police Department (CPD) and "an investigative or law enforcement officer" of the State of Tennessee; that is, an officer of the State

of Tennessee who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Tenn. Code Ann. §40-6-305. I graduated from the Chattanooga Police Academy in 2011 and throughout my law enforcement service, have maintained, as a primary career path, the investigation and seizure of illegal narcotics. I have served as patrol officer, gang investigator, drug interdiction investigator, and firearms/violent crimes investigator since being employed by the Chattanooga Police Department.

4. During my experience and tenure as a narcotics investigator and task force officer, I have investigated and participated in investigations of organized criminal groups violating federal drug trafficking laws. As part of my official duties, I have utilized most traditional law enforcement techniques, including visual surveillance, interviewing of witnesses, the execution of search warrants, the use of cooperating witnesses, the seizure of drug evidence, the controlled purchases of drug evidence, court authorized pen registers, court authorized interceptions of wire communications, the federal grand jury, and undercover techniques. I have debriefed numerous cooperating defendants and confidential informants regarding the habits, practices, methods and general behavior of criminal groups engaged in organized criminal activity.

5. I have personally conducted and participated in Title III wire intercept investigations, including investigations involving large-scale drug trafficking organizations and drug traffickers. I have received specialized training in conducting drug investigations and have attended numerous conferences and lectures featuring government attorneys and law enforcement officials. Over the course of my career, I have participated in numerous arrests of known drug traffickers and their associates. This experience has afforded me an opportunity to observe and investigate methods, schemes, and operations used by organized groups, including

Page 2 of 20

the use of cellular telephones and of digital display paging devices, and their use of numerical codes and code words to conduct their transactions.

6. In addition, I have participated in investigations concerning the concealment of proceeds of controlled substances, including assets, monies, and bank records, and the identification of co- conspirators through the use of drug ledgers, telephone toll records, telephone bills, photographs, and financial records. These investigations have resulted in the arrest of individuals who have smuggled, received, and/or distributed controlled substances, including but not limited to methamphetamine, heroin, cocaine hydrochloride, cocaine base, and marijuana, as well as the seizure of controlled substances and the proceeds of the sale of these controlled substances. I know based upon my training and experience, that narcotics traffickers and money laundering organizations routinely utilize several operation techniques. These practices are designed and implemented to achieve two paramount goals: first, the successful facilitation of the organization's illegal activities that consist of the transportation and distribution of controlled substances and subsequent collection of the proceeds of that illegal activity; and second, minimizing the exposure of organization members, particularly those operating in management roles, from investigation and prosecution by law enforcement.

7. As a result of my experience and training, I am aware that is common for drug traffickers to utilize cellular telephones and other portable electronic devices to communicate about their drug trafficking activities. In a number of investigations that I been involved in, these devices have also been found to function as a computer whereas a subject can access the internet, e-mail servers, social media sites, and other mobile applications which are frequently used to communicate with their sources of supply, customers, and other co-conspirators. These devices also typically contain other data relevant to criminal activity to include GPS and mapping data,

photographs, and contact lists.

8. This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

1. The property to be searched is a cellular device hereinafter identified as Device 1. Device 1 is currently in the Tennessee Bureau of Investigation (TBI) temporary storage custody.

2. The applied-for warrant would authorize the forensic examination of Device 1 for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

1. Beginning in July of 2022, the DEA Chattanooga Resident Office, the Tennessee Bureau of Investigation (TBI), the Chattanooga Police Department (CPD), and other federal, state, and local law enforcement agencies initiated an investigation into subjects involved in methamphetamine drug trafficking. The investigation has shown that Joshua TERRY is a narcotics distributor in and around the Eastern District of Tennessee. The investigation also shows that Joshua TERRY has a source of supply of Richard MERAZ.

2. On July 12, 2022, the Honorable Christopher H. Steger, United States Magistrate Judge authorized search warrant 1:22-mj-178 for the following USPS Mail Parcel in the Custody of the United States Postal Inspection Service.

| From: | To: |
|---|---|
| Eric Whitlock<br>11386 Lake Breeze Drive<br>Yucaipa, CA 92399 | Brittnay Wright<br>208 Maplewood Ave<br>Chattanooga, TN 37411 |

Page 4 of 20

3. On July 11, 2022, TFO Moon and SA Jed Hutchinson executed the search warrant on the aforementioned package and subsequently located a plastic container wrapped in gift wrapping paper containing approximately 5 pounds of methamphetamine in vacuum sealed bags.

4. Based on a review of available databases, there was no "Brittnay Wright" associated with 208 Maplewood Avenue, Chattanooga, TN, 37411. Based on training and experience, investigators know it is common for senders and recipients of illegal drugs and their proceeds to commonly alter their names, utilize partial names, or utilize fictitious names on USPS parcels to hinder law enforcement from identifying the subjects involved in illegal drug trafficking and the trafficking of its proceeds.

5. TFO Moon conducted a query of the recipient address of 208 Maplewood Avenue, Chattanooga, TN 37411. This agent learned that this address has been the recipient of (3) other USPS parcels shipped from this general area of southern California since May of 2022. Upon review of USPS business records, this agent was able to review the label for USPS Parcel 9505 5144 9687 2159 5815 29 which was shipped out of California on June 8, 2022, to 208 Maplewood Avenue, Chattanooga, TN 37411. This parcel was addressed to recipient name "Brittany Moore." This agent was also able to review the label for USPS Parcel 9505 5152 9707 2187 3381 24 which was shipped out of California on July 6, 2022, to 208 Maplewood Avenue, Chattanooga, TN 37411. This parcel was addressed to recipient name "Chris Burton." Based on TFO Moon's training and experience, TFO Moon knows it is common for those subjects utilizing the United States Postal Service to facilitate the trafficking of illegal narcotics to often utilize fictitious sender and /or recipient names to hinder law enforcement from identifying those subjects involved in said illegal activity.

Page 5 of 20

Case 1:23-mj-00224-SKL   Document 2   Filed 07/25/23   Page 5 of 20   PageID #: 8

6. This agent was able to confirm on July 4, 2022, Joshua TERRY, African American Male, Date of Birth: XX/XX/1982 filed a harassment report at 208 Maplewood Avenue, Chattanooga, TN 37411. On July 13, 2022, this agent conducted a drive by of 208 Maplewood Avenue, Chattanooga, TN 37411 and observed TERRY'S 2012 Nissan Maxima with Tennessee Registration "466BBLV" parked in the driveway. This vehicle was confirmed as being registered to Joshua TERRY. Upon further inquiry into TERRY, this agent learned he was previously charged in the United States District Court for the Eastern District of Tennessee with Possession with the Intent to Distribute Cocaine and Possession of a Firearm during the course of a Drug Trafficking Offense in 2005. TERRY was subsequently sentenced to 180 months in the Federal Bureau of Prisons, but has since been released.

7. On July 14, 2022, Chattanooga RO members conducted surveillance at 208 Maplewood Avenue prior to a controlled delivery of a USPS parcel that previously contained methamphetamine. TFO Lauren Moon observed a red Hyundai and a silver Toyota Camry at the residence prior to the controlled delivery. USPIS Jedidiah Hutchinson setup to conduct the controlled delivery of the USPS parcel that contained "sham" illegal narcotics and a tracking device/light sensor device as well as TFO Headden monitoring USPIS Hutchinson via a telephone call. At approximately 4:02 PM, USPIS Hutchinson arrived at 208 Maplewood Avenue and made contact with Lanisha BRIDGES at the residence at which time BRIDGES stated "Thank you, we have been waiting for this." USPIS Hutchinson provided BRIDGES with the USPS parcel at which time BRIDGES took the USPS parcel into the residence and USPIS Hutchinson left the area.

8. Chattanooga RO members maintained a visual on the residence as well as monitoring the tracking/light sensor device. TFO Headden observed the USPS parcel to be in

Page 6 of 20

Case 1:23-mj-00224-SKL   Document 2   Filed 07/25/23   Page 6 of 20   PageID #: 9

the front right corner of the residence for an extended period of time prior to TFO Moon observing the grey Toyota Camry leaving the residence towards Old Mission Road. TFO Moon then observed BRIDGES exit the residence and start to get into her red Hyundai then went back into the residence. TFO Headden then observed that the GPS tracking device on the USPS parcel moved to the middle back of the residence. At that time, Chattanooga RO members approached the residence and knocked and announced at the front door of 208 Maplewood Avenue at which time BRIDGES opened the front door and was detained. Chattanooga RO members found no other occupants in the residence.

9. A search of the residence, agents located the USPS parcel involved in the controlled delivery as well as a kilogram press with fentanyl powder residue, several clear plastic bags of fentanyl powder residue, other USPS parcels, several plastic containers with methamphetamine residue that matched the containers containing the 5 pounds of methamphetamine in the controlled delivery USPS parcel, along with large vacuum sealed bags. All of these items are indicative of illegal narcotics distribution.

10. After BRIDGES was detained, TFO Garrett Woody read BRIDGES her Miranda rights and she stated that she understood her rights and agreed to speak with Investigators. TFO Woody then began to ask BRIDGES what occurred prior to the controlled delivery. BRIDGES stated that Josh TERRY, the owner of the residence, requested BRIDGES to come over and let TERRY's mother into the house to retrieve some food. BRIDGES stated that TERRY also requested BRIDGES to stay at the residence and wait on a package to be delivered from United States Postal Service (USPS) after giving his mother the food. BRIDGES agreed to stay at the residence and accept the package when it arrived.

Page 7 of 20

Case 1:23-mj-00224-SKL    Document 2    Filed 07/25/23    Page 7 of 20    PageID #: 10

11. BRIDGES advised when she observed the USPS carrier vehicle, she accepted the package from the mail carrier and then took it inside of the residence and placed it into a chest drawer. After placing the package into the drawer BRIDGES advised she was gathering her things and going to leave to return back home. TFO Woody then asked BRIDGES if she was aware what was in the package and she stated she did not.

12. TFO Woody then asked BRIDGES if she would place a phone call to TERRY and tell him that his package has arrived. BRIDGES agreed and soon after TERRY called BRIDGES with a Facetime call. BRIDGES answered the call and advised TERRY that his box arrived. TERRY acknowledged that the box arrived and questioned BRIDGES if she marked send back to receiver on the box and circled it and BRIDGES stated that yes she did. The Facetime call was then concluded and TFO Woody asked BRIDGES what TERRY asked and BRIDGES stated that he wanted her to mark send back to receiver on the box and BRIDGES stated that she did do that.

13. TERRY continued to attempt to call BRIDGES several times afterwards but no further calls were answered. TFO Woody then asked BRIDGES to look through her text messages and Facebook messages between herself and TERRY. BRIDGES agreed to let TFO Woody look through the phone. While looking through the phone, TFO Woody observed messages between BRIDGES and TERRY who had the contact name of "Josh".

14. The first pertinent messages observed between BRIDGES and TERRY was on Monday, 7/11/2022, at approximately 3:44 PM. The message thread started with BRIDGES telling TERRY "I'm here babe". TERRY responded back with "He said between 330 and 5" then "Keep your eye out" and BRIDGES stated "ok". On the same date at approximately 6:08 PM,

Page 8 of 20

Case 1:23-mj-00224-SKL   Document 2   Filed 07/25/23   Page 8 of 20   PageID #: 11

BRIDGES stated, "It maybe tomorrow before your package is land unless it come by 8". TERRY responded "No it's coming" followed by BRIDGES "Ok" and TERRY stated "They jus running late" then "I hope nothing happened while we were gone". BRIDGES replied, "he would get a confirmation right" then "No big deal I'm waiting" and TERRY stated "Thx".

15. On 7/13/2022, TERRY messaged BRIDGES and asked "Are u on the look our bby" and BRIDGES replied with "It's here". TERRY responded back with "Bet... circle and return to send with a pen or marker plz" then "So I know u good" and BRIDGES replied "ok".

16. TFO Woody then began to question BRIDGES if she was aware if TERRY sold narcotics. BRIDGES advised that she knew TERRY sold marijuana but was unaware of any other illicit items. BRIDGES admitted to knowing that she believed this parcel to contain narcotics but she believed it was marijuana instead of methamphetamine. Resident Agent in Charge (RAC) William Wise asked BRIDGES why she believed that package to contain narcotics and BRIDGES stated that she has heard TERRY have previous conversations with an unknown party identified as either "Richard" or "P" but is unaware of who that person is. BRIDGES stated that the conversation seems to be the source that sends the package but cannot confirm that. Due to no further information being provided, BRIDGES was then released and free to leave at that time.

17. Following the controlled delivery, USPIS Lauren Moon sent off several of the plastic containers and USPS parcels located inside the residence for fingerprint analysis to the USPIS laboratory. On August 26, 2022, TFO Headden received the USPIS laboratory results for the fingerprint analysis and found that fingerprint analysis on USPS Parcel Box that was recovered from 208 Maplewood Avenue had the palm print of Richard MERAZ on the exterior

Page 9 of 20

Case 1:23-mj-00224-SKL    Document 2    Filed 07/25/23    Page 9 of 20    PageID #: 12

of the USPS parcel. TFO Headden is familiar with MERAZ being the source of supply for TERRY and being based out of Southern California. TFO Headden also found that fingerprint analysis of Plastic Containers recovered from 208 Maplewood Avenue had several fingerprints of Joshua TERRY on the container and the lid. TFO Headden is familiar with these plastic containers being recovered from underneath the bed in the bedroom of TERRY and in a spare bedroom. These plastic containers were the same as what was recovered from the USPS parcel containing approximately 5 pounds of suspected methamphetamine. Furthermore, TFO Headden found that one of the containers with TERRY's fingerprints had methamphetamine residue which was tested on scene utilizing a Narcotics Analysis Reagent Kit (NARK) and tested positive for methamphetamine. The NARK testing kits are for presumptive identification of the suspected narcotics.

18. On October 25, 2022, Joshua TERRY, Lanisha BRIDGES and Richard MERAZ were indicted in the Eastern District of Tennessee for conspiracy to distribute methamphetamine. On November 2, 2022, TFO Headden located TERRY at T-Mobile and TERRY was taken into custody at that time. TFO Headden found TERRY in possession of a white iPhone with a clear case and took possession of the iPhone. TFO Headden then transported the white iPhone with a clear case, placed it into DEA temporary storage and later transferred it to TBI custody pending search warrant and extraction.

19. In late June, 2023, co-defendant Richard MERAZ began cooperating with the government's investigation. On July 10, 2023, as part of the information he provided, MERAZ told investigators that during the course of the conspiracy with TERRY, he would regularly communicate with TERRY on TERRY's iPhone – the target telephone that is the subject of this

affidavit. Specifically, MERAZ stated that he communicated with TERRY in the days leading to the incident in which the package containing 5 pounds of methamphetamine that MERAZ assisted in sending to TERRY in Chattanooga and which was the subject of a previous federal search warrant, as described above. MERAZ and TERRY communicated about matters involving the sale and delivery of large amounts of narcotics.

20. Based upon the statements of BRIDGES and text messages observed between BRIDGES and TERRY, as well as the recent information obtained from MERAZ, your affiant believes that TERRY utilized the white iPhone with a clear case to further his narcotics distribution as well as communicate with MERAZ, who was associated with TERRY's source of supply in California and helped facilitate narcotics transactions with TERRY using the target telephone.

**Conclusion**

21. Based on the above-described facts, your Affiant believes that Joshua TERRY is a distributor and/or courier of illegal narcotics in the Eastern District of Tennessee. Based upon the evidence in the above paragraphs and the subsequent arrest, your affiant believes that there is evidence related to the illegal narcotics distribution on Device 1. Your affiant in my training and experience has also found that illegal narcotics distributors will take photographs of illegal firearms and narcotics on their cellular devices as well as communicate via text messages along with other various applications with customers and sources of supply.

22. Device 1 is currently being stored at the Tennessee Bureau of Investigation temporary storage. Based on my training and experience, I know that the Device has been stored

in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as it was when the Device came into the possession of the DEA.

## TECHNICAL TERMS

23. Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved

Page 13 of 20

Case 1:23-mj-00224-SKL   Document 2   Filed 07/25/23   Page 13 of 20   PageID #: 16

in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

24. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I believe that Device 1 has capabilities that allow it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and/or PDA. Device 1 also has Internet capabilities. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

25. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

26. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how Device 1 was used, the purpose of their use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on these devices because:

   a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

Page 16 of 20

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

27. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the devices consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

28. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

29.  I submit that this affidavit supports probable cause for a search warrant authorizing the examination of Device 1 (as described in Attachment A) to seek the items described in Attachment B.

[SIGNATURES ON FOLLOWING PAGE]

Respectfully submitted,

_____
Justin Headden
DEA Task Force Officer

Subscribed and sworn to before me
On July 25, 2023:

_____
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

The property to be searched is a cellular device-a White IPhone in a clear case-- hereinafter identified as Device 1. Device 1 is currently in the Tennessee Bureau of Investigations temporary storage custody. This warrant authorizes the forensic examination of the Device for the purpose of identifying the electronically stored information described in Attachment B.

# ATTACHMENT B

1. All records on the Device described in Attachment A that relate to violations of Title 21, United States Code, Sections 841(a)(l), 846, and 843(b) and Title 18 U.S.C. § 922(g)(l), and involving Joshua TERRY, including:

    a. lists of customers and related identifying information;

    b. types, amounts, and prices of drugs and firearms trafficked as well as dates,

    c. places, and amounts of specific transactions;

    d. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information).

    e. all bank records, checks, credit card bills, account information, and other financial records.

2. Evidence of user attribution showing who user or owned the Device at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saves usernames and passwords, documents, and browsing history.